**UNITED STATE DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
NORTHWELL HEALTH, INC.,

                    Plaintiff,

                                                                          Case No. 2:23-cv-01362-ENV-AYS

        -against-

CAPITAL BLUE CROSS,

                    Defendant.
-----------------------------------------------------------x


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**


Timothy F. Butler, Esq.
Meredith F. McBride, Esq.
David J. McCarthy, Esq.
BUTLER TIBBETTS, LLC
*Attorneys for Plaintiff Northwell Health, Inc.*
Nine East 45th Street, 9th Floor
New York, NY 10017
Telephone: (203) 656-1066

1

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................................................. ii

**PRELIMINARY STATEMENT** .......................................................................................... 1

**SUMMARY OF FACTS ALLEGED** ................................................................................. 1

**LEGAL ARGUMENT** .......................................................................................................... 4

**POINT I: The AC States A Valid Claim For Breach Of The Provider Agreement.** ............ 4

**A. The AC sufficiently pleads grounds to sue Defendant, a non-signatory of the Provider Agreement, for Defendant's breach of it.** .................................................................. 5

**1. Empire acted as Defendant's agent.** ........................................................................ 5

**2. Other bases the non-signatory Defendant is bound by the BlueCard terms in the Provider Agreement.** ................................................................................................ 9

**a. Functional privity.** ............................................................................................ 9
**b. The Provider Agreement, and other documentary evidence, evince Defendant's obligation to pay Northwell.** ........................................................................... 11
**c. Non-signatory's manifestation of intent to be bound.** ................................. 12

**B. The AC quotes Provider Agreement terms obligating Defendant to pay Northwell.** ..... 13

**POINT II: The AC Pleads A Valid Third-Party Beneficiary Claim For Breach Of The Obligations By, And Between, Empire And Defendant, as BCBSA Licensees.** .............. 17

**POINT III: The Third Cause Of Action States A Valid, Alternative Quasi-Contract Claim Against Defendant.** ........................................................................................................ 20

**A. Defendant benefited from Northwell's healthcare services.** ........................................ 20

**B. The AC properly pleads an alternative quasi-contract claim.** ....................................... 22

**CONCLUSION** ....................................................................................................................... 23

## **TABLE OF AUTHORITIES**

Cases

*Aievoli v. Farley*, 636 N.Y.S.2d 833 (2d Dept. 1996) ........................................................ 19

*Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F.Supp.3d 379 (2019) ............................. 5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................. 4

*ATSI Communications Inc. v. Shear Fund, Ltd*., 493 F.3d 87 (2d Cir. 2007) ........................ 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................. 4

*Bild v. Konig*, 2011 WL 1563576 (E.D.N.Y. Apr. 25, 2011) ............................................... 18

*Cal. Spine & Neurosurgery Inst. V. Oxford Health Ins. Inc.*, 2019 WL 6171040 (N.D. Cal. Nov. 20, 2019) ......................................................................................................................... 21

*Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208 (E.D.N.Y. 2018) ........................................ 4

*El Paso Healthcare Sys., LTD v. Molina Healthcare of N.M., Inc.*, 683 F. Supp. 2d 454 (W.D. Tex. 2010) .......................................................................................................................... 21

*Emergency Physician Services of New York v. UnitedHealth Group, Inc*., 2021 WL 4437166 (S.D.N.Y. September 28, 2021) ........................................................................................... 21

*ESI, Inc. v. Coastal Corp.*, 61 F.Supp.2d 35 (S.D.N.Y. 1999) .......................................... 11

*Eternity Glo. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168 (2d Cir. 2004) ... 5

*Fla. Emergency Physicians Kang & Assocs., M.D.,* 526 F. Supp. 3d 1282 (S.D. Fla. 2021) ...... 21

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38 (1985).......................... 18

*GFE Glob. Fin. & Eng'g Ltd. v. ECI Ltd. (USA), Inc.*, 291 F.R.D. 31 (E.D.N.Y. 2013) ............. 14

*Impulse Marketing Group, Inc. v. National Small Business Alliance, Inc.*, 2007 WL 1701813 (S.D.N.Y. June 12, 2007)................................................................................................. 12

*Kahuna Group, Inc. v. Scarano Boat Building, Inc.*, 984 F. Supp. 109 (N.D.N.Y. 1997) ............ 9

*Kapsis v. American Home Mortg. Servicing Inc*., 923 F. Supp. 2d 430 (E.D.N.Y. 2013) ....... 9, 23

*Kitchen Winners NY Inc. v. Rock Fintek LLC*, 2023 WL 2746031 (S.D.N.Y. March 31, 2023) ... 5

*MBI Ins. Corp. v. Royal Bank of Canada*, 706 F.Supp.3d 380 (S.D.N.Y. 2009)  ....................... 12

*Mumin v. Uber Techs, Inc*., 239 F. Supp. 3d 507 (E.D.N.Y. 2017) ....................................... 14

*N.Y.C. Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S.2d 540 (N.Y. Sup. Ct. 2011) ................................................................................................................................. 21

*Pereira v. Ocwen Loan Servicing, LLC*, No. 11-cv-2672 (SJF) (ETB), 2012 WL 1381193 (E.D.N.Y. Apr. 18, 2012)................................................................................................... 9

*Plastic Surgery Ctr. v. Aetna Life Ins. Co.*, 967 F.3d 218 (3d Cir. 2020).................................... 21

*Pollock v. Ridge*, 310 F. Supp. 2d 519 (W.D.N.Y. 2004).................................................... 18

*River Park Hospital, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 173 S.W.3d 43 (Tenn. Ct.App. 2002).................................................................................................................. 21

*St. John's University v. Bolton*, 757 F. Supp. 2d 144 (E.D.N.Y 2010) .................................. 23

*Temple University Hospital, Inc. v. Healthcare Management Alternatives, Inc.*, 832 A.2d 501 (Pa Super. 2003) .................................................................................................................. 21

*Thomas v. New York City*, 814 F. Supp. 1139 (E.D.N.Y. 1993) ......................................... 18

*USHA Holdings, LLC v. Franchise India Holdings Ltd.*, 11 F. Supp.3d 244 (E.D.N.Y. 2014) .................................................................................... 13, 14

*York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122 (2d Cir. 2002) ..................................... 4

**Other Authorities**

Internal Revenue Service Chief Counsel Memorandum, 2013 IRS NASR 3701F, 2013 WL
10257206 (released Sept. 13, 2013)............................................................................6-8, 11, 12

Plaintiff Northwell Health, Inc. ("Northwell"), by and through its attorneys, Butler Tibbetts LLC, submits this memorandum of law in opposition to the motion of Defendant Capital Blue Cross ("Defendant") to dismiss the Amended Complaint, Doc. No. 17 ("AC"), pursuant to Rule 12(b)(6).

## PRELIMINARY STATEMENT

Northwell brings this action because, although Defendant accessed Northwell's in-network services under Northwell's Provider Agreement, and, in accordance with the terms of that same agreement, authorized and directed payment to Northwell for the healthcare services Northwell provided to Defendant's insureds, Defendant's authorized payment to Northwell was not for the correct amount due under that Provider Agreement. Nevertheless, Defendant baselessly asserts in its motion to dismiss that it has no obligation at all, under any legal theory, to pay to Northwell the correct rate for the healthcare services provided to patients insured under Defendant's health plans.

## SUMMARY OF FACTS ALLEGED

Northwell has an in-network Provider Agreement with Empire Blue Cross ("Empire"), which as amended, Northwell refers to herein as the "Provider Agreement." (AC ¶¶ 18-19)

Empire and Defendant are two of the thirty-four members of the Blue Cross Blue Shield Association ("BCBSA"). (AC ¶ 10)  As BCBSA members, they both must "effectively and efficiently participate in [the BCBSA's Blue Card Program] . . . adopted by the Member Plans for the purposes of providing portability of membership between the Plans and ease of claims processing for customers receiving benefits outside of the Plan's Service Area."  Each of them also "shall take such action as required to ensure its financial performance in programs and contracts of an inter-Plan nature [including the Blue Card Program]."  (AC ¶¶ 11-13)

The BCBSA's BlueCard program "links participating healthcare providers and the [thirty-four] independent Blue Cross Blue Shield companies across the country in a single electronic network for claims processing and reimbursement" and the BCBSA refers to the participating healthcare providers of all the BCBSA members as "our national network" and "the most trusted healthcare network in America." (AC ¶¶ 14-16)

Empire, as a participant in the BCBSA program, was required to, and therefore, had the consent and authorization of all the other BCBSA members to, include the following BlueCard Program provisions (the "BlueCard terms") in its Provider Agreement with Northwell (AC ¶¶ 20-23, 41):

(1) a requirement that "all Payers (as defined below) shall be entitled to access the services of [Northwell] Providers that participate in the Empire network," and a definition of the "Payers" granted such access which includes both Defendant's "Blue Card Plans" and any customers "entitled to access the network of any [of Defendant's] Blue Card Plan[s];" (*Id*. at ¶¶ 21, 41)[1]

(2) a requirement the "Payers" pay Northwell for such services "at the applicable rates and all the other applicable terms of this Agreement;" (*Id*. at ¶¶ 21, 41)

(3) a requirement that "Payers" are "bound by . . .the applicable terms of [the Provider] Agreement," which Payers who are so bound is defined to explicitly include Defendant's "Blue Card Plans" and any customers "entitled to access the network of any [of Defendant's] Blue Card Plan[s];" (*Id*. at ¶¶ 22, 41) and

(4) a reference to "the following parties who are legally responsible for payment of Covered Services," and defines such "legally responsible" parties to include Defendant's "Blue Card Plans" and any customers "entitled to access the network of any [of Defendant's] Blue Card Plan[s]." (AC ¶¶ 22, 41)

When a patient insured by one of Defendant's BlueCard plans received healthcare from Northwell, that patient presented an insurance card that the patient received from Defendant.

---

[1] "Blue Card Plans" are defined as "any plans affiliated with the Blue Cross and Blue Shield Association." (*Id*.)

Northwell understood and reasonably believed that Defendant intended its insurance card to assure Northwell that Defendant would pay for the healthcare provided to the Patient under the BlueCard program, consistent with the terms in the Provider Agreement, that Defendant was the "Payer" "**bound** by the applicable rates and all other applicable terms of this Agreement" and that Payer was the "part[y] . . . legally responsible for payment of Covered Services" provided to the patients insured by Defendant's Blue Card Plans.  (AC ¶¶ 22, 25-27)

Northwell timely submitted to Empire separate statements of its billed charges for the medically necessary healthcare that Northwell provided to each of the Patients insured by Defendant during the period from January 1, 2019 through December 31, 2022.  The total of such billed charges is $1,449,252.91. (AC ¶¶ 5, 28) Northwell understood that Empire would work with Defendant to process the claim and then present Northwell's billed charges to the Home Plan in a standard claim format from which the Home Plan then makes a claim determination and transmits the claim disposition to Empire. (AC ¶¶ 29-30)

After the Defendant Home Plan transmits the claim determination on a Northwell claim, Empire will then send to Northwell an explanation of payment or the remittance advice that Empire received from Defendant. (AC ¶ 31) The Provider Agreement does not say Empire is the "Payer" of these claims; it says Defendant is the responsible "Payer."  If Empire makes a payment to Northwell for healthcare services provided to Defendant's insureds, Empire only does so as an agent for Defendant, and only after Defendant has transmitted the payment to Empire or Defendant has already funded an account which Empire is authorized to access to make the payments to Northwell on Defendant's behalf.  (AC ¶¶ 33-34)

The amount that Defendant underpaid, and still owes to Northwell is no less than $614,874.89 (AC ¶ 38) and "the applicable terms" of the Provider Agreement that Defendant was "bound by," but failed to adhere to, are described in detail in the AC.  (AC ¶¶ 49-51)

## LEGAL ARGUMENT

"To survive a [Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual material, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint's factual allegations must be sufficient to "nudge[ ]" the plaintiff's claims "from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.

A court "accept[s] all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." *ATSI Communications Inc. v. Shear Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007); *York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) (court "construe[s] the complaint in the light most favorable to the plaintiff[.]").  Fed. R. Civ. P. 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678.

**POINT I: The AC States A Valid Claim For Breach Of The Provider Agreement.**

To allege a breach of contract, a plaintiff must plead "(1) the existence of a contract, (2) adequate performance of the contract by plaintiff, (3) breach of the contract by defendant, and (4) damages. *Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 218 (E.D.N.Y. 2018) (quoting

4

*Eternity Glo. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). The AC pleads each of these elements.

The two bases Defendant asserts to dismiss the claim are meritless.

**A. The AC sufficiently pleads grounds to sue Defendant, a non-signatory of the Provider Agreement, for Defendant's breach of it.**

Defendant asserts the court should dismiss the breach of contract claim because Northwell "has not and cannot establish contractual privity between [Northwell] and [Defendant]." (Moving Memo at 8) In support, Plaintiff, citing paragraph 18 of the AC, repeatedly asserts Northwell "admits that [Defendant] is not a party to the Provider Agreement. (Moving Memo at 6, bullet 1; at 7, B(1); at 8) The cited paragraph identifies the signatories to the Provider Agreement. (AC ¶18) Elsewhere in the AC Northwell alleges that, although Defendant did not sign the Provider Agreement, it nevertheless is bound by its terms. (AC ¶¶ 41-46, see also AC ¶¶ 20-23, 25-27, 33-34, and 52)

Plaintiff's assertion that it is not a party to the Provider Agreement because it did not sign it ignores that the AC pleads numerous facts that support a number of exceptions when a non-signatory to a contract is nevertheless bound as a party to it.

**1. Empire acted as Defendant's agent.**

One such exception is where the contract in question – here the Provider Agreement – was signed by the non-signatory's agent. *See e.g.*, *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 2023 WL 2746031, at *11-12 (S.D.N.Y. March 31, 2023) ("a contract may bind a party that did not sign the contract 'where the contract was signed by the party's agent[.]'"); *see also Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F.Supp.3d 379, 390 (2019) (recognizing non-signatory is bound to a contract when his agent signed it, but dismissing contract claim which did not allege a signatory acted as defendant's agent).

Here, the AC alleges Empire acted as Defendant's agent in connection with making payments to Northwell on Defendant's behalf and only after being authorized and directed to do so, and only if Defendant first provided the funds to Empire or to an account from which Empire would have access for an immediate reimbursement for the payment to Northwell.  (AC ¶¶ 31, 33, 34) Likewise, the AC alleges Empire facilitated Defendant's claims processing in a manner that was consistent with it acting as Defendant's agent.  (AC ¶¶ 28-29, 31, 33-34)

The AC also pleads Empire, in conforming to the mutual obligations by and between the BCBSA Members in the BlueCard Program, included the BlueCard terms in the Provider Agreement to (1) give all other BCBSA Members access to the same in-network rates Northwell agreed to with Empire, (2) to specify that all other BCBSA Members were "bound by all the other applicable terms of" the Provider Agreement, (3) to identify Defendant as a "party" in the Provider Agreement, and (4) to identify Defendant as a "Payer" responsible to pay Northwell for the healthcare provided to Defendant's insureds.  (See supra at 2-3, with citations to AC)

These, and the related allegations, plausibly support a finding that Empire was acting as an agent for the other BCBSA Members, including Defendant, when it added the BlueCard terms to the Provider Agreement, when it signed the Provider Agreement, when it helped process Northwell's claims, and when it paid Northwell, on behalf of, and at the direction and with the authorization of, Defendant, which immediately reimbursed its agent for having made the payment on its behalf.

The Office of the Chief Counsel of the Internal Revenue Service also found the relationship between the Home and Host Licensees in the BCBSA BlueCard Program a principal-agent relationship.  *See* Internal Revenue Service Chief Counsel Memorandum, 2013

IRS NASR 3701F, 2013 WL 10257206 (released Sept. 13, 2013).[2]  In the Memorandum, the Chief Counsel responded to an inquiry whether a BCBSA Host Licensee (such as Empire in this case) or a BCBSA Home Licensee (such as Defendant in this case) was entitled to a tax deduction for payments made to local providers who provided care to patients insured under a BlueCard Plan of the BCBSA Home Licensee.  (IRS Memo. at 4)

The Chief Counsel describes at length how such provider claims are processed, beginning with the provider submitting its charges to the local Host Licensee, and later resulting in the Home Licensee issuing a Disposition Form which includes the result of its claim determination and an authorization to the Host Licensee to pay the healthcare provider the specified amount. (*Id*. at 5-6) The Host Licensee then records its own receivable from the Home Licensee for reimbursement of the **"approved provider payment"** which the Home Licensee directed the Host Licensee to make to the provider on its behalf.  (*Id*. at 7) (emphasis added).  The Home Licensee makes a complementary record of its own liability to reimburse the Host Licensee for the payment the Host Licensee made to the provider, at the direction of, and on behalf of, the Home Licensee.  (*Id*. at 6-7)

After Host Licensee makes the approved provider payment authorized by the Home Licensee, a Bank retained to administer the payments among the BCBS Licensees in the BlueCard Program, referred to as the Central Finance Agency, then makes transfers in the Home and Host Licensees' accounts to reimburse the Host Plan for the payment made to the local provider with the authorization of the Home Licensee.  (*Id*. at 8)

According to the Chief Counsel, the pertinent agreements and procedures governing the interactions among the Home and Host Licensees and the CFA Bank were established because

---

[2] Cited for plausibility reference only, not for legal conclusions therein.

the BCBSA "recognize[s] that the BCBS Licensees will make benefit payments **on behalf of other Licensees** and that, pursuant to the Licensees' license agreement with BCBSA, each Licensee is required to reimburse the Licensee that makes the benefit payment **on its behalf**." (*Id*. at 8) (emphasis added) This language describes a principal-agent relationship between the Home Licensee and Host Licensee, respectively, which the Chief Counsel later confirms, stating:

> Taxpayer (Host Plan) is reimbursed by the Home Plan for provider payments through the CFA within 3 to 5 days. . . .  Taxpayer (Par/Host Plan) merely pays the claims **(claims processing agent)** and is reimbursed by the Home Plan for claim payments[.] [ Taxpayer] does not assume any risk of not being reimbursed for payments to providers.

(*Id*. at 15) (emphasis added).

The Chief Counsel of the IRS found the Host Plan's payments to its in-network providers, such as Northwell, "are not for claims, liabilities or expenses incurred by the [Host] Taxpayer [but rather] are the result of [provider] claims against, or incurred by, other Blue Plans – the Home Plans – for out-of-territory services rendered to the Home Plan's Members." (*Id*. at 14)  In addition, Chief Counsel found (1) "[t]the Home Plan bears all insurance risk," and (2) the "Taxpayer [Host Plan] has no insurance risk." (*Id*. at 15-16)[3]

For these reasons, Northwell pleads a facially plausible claim, based on factual allegations, that Empire acted as Defendant's agent when it included the BlueCard terms in the Provider Agreement, and later, when Empire assisted in the processing of Northwell's claims for services provided to patients insured under Defendant's BlueCard Plans, and then paid Northwell the amount authorized by Defendant, and shortly thereafter was reimbursed by Defendant for

---

[3] The Chief Counsel's findings, including that the Host Licensee acts as the agent for the Home Licensee, "is based upon an examination and analysis of records (License Agreement, Membership Standards, Inter-Plan Programs Manuals, BlueCard Program Manual, CFA contract, and other necessary information) provided by Taxpayer to substantiate the nature and amount of the Host deductions." (*Id.* at 4, and 17-18)

that payment to Northwell.  This alone is basis to assert a claim for breach of the BlueCard in the

Provider Agreement against Defendant, Empire's Home Licensee principal.  Defendant does not

cite to any contrary authority.[4]

> ### 2. Other bases the non-signatory Defendant is bound by the BlueCard terms in the Provider Agreement.

> #### a. Functional privity.

A non-signatory also can be bound by the terms of a contract where there is functional

privity with the signatories to the contract.  In *Kahuna Group, Inc. v. Scarano Boat Building,*

*Inc.*, 984 F. Supp. 109 (N.D.N.Y. 1997), the court denied a motion for summary judgment to

dismiss a breach of contract claim against a non-signatory to a contract.  The court found there

was sufficient evidence of the functional equivalent of privity because the plaintiff "understood

the written agreement to encompass [the non-signatory] Defendants as well, particularly because

[plaintiff] was never told that the [non-signatory] Defendants were not part of the [signatory

Defendant's] operation."  *Id*. at 113.

The AC alleges far more substantial functional privity than the evidence the court relied

upon in finding the there was a disputed issue of fact whether there was functional privity.  The

AC pleads that the Provider Agreement actually references the Defendant (i) in a clause referring

to the pertinent Home Blue Card Plans as one of "the following parties", (ii) in a clause stating

the Home Blue Card Plans are "bound by the applicable rates and all other applicable terms of

---

[4] Defendant cites two mortgage loan servicer cases in support of its argument that there is no privity.  *Kapsis v. American Home Mortg. Servicing Inc*., 923 F. Supp. 2d 430, 451 (E.D.N.Y. 2013); *Pereira v. Ocwen Loan Servicing, LLC*, No. 11-cv-2672 (SJF) (ETB), 2012 WL 1381193, at *3 (E.D.N.Y. Apr. 18, 2012).  The cases are inapposite. Neither plaintiff in the cited cases asserted, as Northwell does here, a claim that a contract signatory included terms in the pertinent contract on behalf of a non-signatory principal, and then acted as the non-signatory's agent in connection with the alleged breaches.  *Kapsis*, 923 F. Supp. 2d at 451; *Pereira,* 2012 WL 1381193, at *3. Moreover, Defendant ignores that the Court in *Kapsis* permitted the plaintiff to amend its breach of contract claim to allege the non-signatory loan servicer was acting as the agent for its principal, the mortgage lender, and therefore the privity of the lender could be imputed to the loan servicer. *Kapsis*, 923 F. Supp. 2d at 450-452.

[the Provider] Agreement", and (iii) in a clause stating the Home Blue Card Plans, including Defendant, are "Payers . . . responsible to pay for Covered Services" under any of their Home Blue Card Plans.  See *supra* at 2, with cites to AC.  In light of such provisions, Empire projected, and Northwell reasonably understood, that Defendant was bound by the BueCard terms in the Provider Agreement.

It also was reasonable for Northwell to understand Defendant was the Payer responsible to pay Northwell given Defendant's (1) direction to its insureds to provide providers in other states with Defendant's insurance cards, which identified Defendant as a Blue Card Plan insurer (AC ¶¶ 7-8, 25-27), and (2) long history of accessing Northwell's in-network provider rates, making claim determinations when its insureds received care from Northwell under the Provider Agreement, and then authorizing and directing Empire, its agent, to pay Northwell for such healthcare, and then reimbursing Empire for those payments made on behalf of Defendant to Northwell. (AC ¶¶ 43, 30-31, 34)

The AC also pleads that the BCBSA, which dictates the terms by which its Members are to administer the BlueCard Program, states on its website that the BlueCard program:  "links participating healthcare providers and the [thirty-four] independent Blue Cross Blue Shield companies across the country in a single electronic network for claims processing and reimbursement" and refers to the participating healthcare providers of all the BCBSA members as "our national network" and "the most trusted healthcare network in America." (AC ¶ 14-16) This language also reflects that the BCBSA understands that there must be functional privity between Northwell, as an in-network healthcare provider of both Empire, and every other Home BCBSA Licensee that insures a patient treated at Northwell.

The AC also alleges this functional privity is dictated by Defendant's and Empire's respective obligations under the Blue Card Program, including Defendant's obligation to pay Northwell for the healthcare provided to patients insured under Defendant's Blue Card Plans. (AC ¶ 45)  Consistent with what the AC pleads, the IRS Chief Counsel, also reached the factual conclusion that under the BCBSA Licensees and Membership Standards, and numerous documents regarding the BlueCard Program, (1) it is the Home Licensee (Defendant here), and not the Host Licensee (Empire here), who has the liability to pay the local in-network provider for the healthcare treatment of patients insured under the Home Licensee's Blue Card Plans (IRS Memo at 6-7); and (2) the Host Licensee's payments to its in-network provider are not for claims against, or incurred by the Host Licensee, but rather are the result of that provider's claims against, or incurred by, the Home Plans for healthcare treatment of its insureds.  (IRS Memo at 14)

### b.  The Provider Agreement, and other documentary evidence, evince Defendant's obligation to pay Northwell.

A complaint also sufficiently pleads contract privity with a non-signatory where it alleges (1) the contract contains terms anticipating the defendant's current and future involvement in the contract activity, and (2) other documentary evidence exists showing the non-signatory's liability for the contract activity.  *ESI, Inc. v. Coastal Corp.*, 61 F.Supp.2d 35, 73-74 (S.D.N.Y. 1999) (finding plaintiff adequately alleged privity with a non-signatory by alleging contract "evinces [Defendant's] current involvement and future . . . role" in the subject of the contract, and alleging "other documentary evidence exists with respect to" Defendant's liability for the subject covered in the contract.).

Here, the AC alleges in detail the terms in the Provider Agreement regarding the current and future involvement of the other BCBSA Members, including Defendant, in the Blue Card

activity covered in the Provider Agreement.  (AC ¶¶ 20-52)  The AC also alleges that other documents, including Defendant's Licensee Agreement with the BCBSA and documents relating to the BlueCard Program, require what the Provider Agreement states; *i.e.* that Defendant, and not Empire, has the liability and obligation to pay Northwell, as an in-network provider of healthcare to patients insured by Defendant, the amount due under the terms of the Provider Agreement.  (AC ¶¶ 14-15, 20-23, 33, 41-42, 45-46)  As noted above, the IRS Chief Counsel, after reviewing numerous documents related to the BlueCard Program, also agrees that Defendant, as the Home BCBSA Licensee, and not Empire, has the liability to pay the amount due to Northwell for healthcare provided to patients insured under Defendant's BlueCard Plans, and that payments by Empire to Northwell were not the result of a liability incurred by Empire, but rather are on account of provider claims against, or incurred by, a Home Licensee.  (IRS Memo at 6-7 and 14)

### c.  Non-signatory's manifestation of intent to be bound.

A pleading also sufficiently alleges contract privity with a non-signatory when it sets forth facts reasonably supporting an inference the non-signatory "manifested an intention to be bound by the contract."  *See MBIA Ins. Corp. v. Royal Bank of Canada*, 706 F.Supp.2d 380, 396, 397-98 (S.D.N.Y. 2009) (citing cases).  "A written contract need not be signed to be binding against a party, so long as the party indicates through performance of its terms or other unequivocal acts that it intends to adopt the contract."  *Impulse Marketing Group, Inc. v. National Small Business Alliance, Inc.*, 2007 WL 1701813, *5 (S.D.N.Y. June 12, 2007).

The AC includes allegations that plausibly support a finding that Defendant, through its performance of the terms of the Provider Agreement, and other unequivocal acts, manifested its intention to be bound by the Blue Card terms in it.  For example, Defendant on countless

occasions adhered to the BlueCard term in the Provider Agreement that the Home Blue Card

Plans, including Defendant's, are bound by Northwell's in-network rates, and other applicable

terms, in the Provider Agreement.  (AC ¶ 43)  Also, Defendant on numerous occasions, as

required by, and in accordance with, the Blue Card terms in the Provider Agreement,

acknowledged its liability to pay Northwell's claims by (i) authorizing and directing Empire, to

pay Northwell's claim, on behalf of Defendant, for care Northwell provided to patients insured

under Defendant's BlueCard Plans and (ii) providing Empire with the funds to do so.  (AC ¶¶

32-34) In addition, in every instance in which a Northwell submitted a claim for healthcare

rendered to a patient insured under Defendant's Blue Card Plans, Defendant was actively

involved with Empire in determining the amount due to Northwell under the terms of the

Provider Agreement.  (AC ¶¶ 29-32, 36-37)

      For these reasons, Northwell states a facially plausible claim that Defendant manifested

its intent to be bound by the Provider Agreement despite Defendant not being a signatory to it.

**B.  The AC quotes Provider Agreement terms obligating Defendant to pay Northwell.**

      Defendant, in its second basis to dismiss the breach of contract claim, asserts that even if

it is "bound by the terms of the Provider Agreement," Northwell "has not and cannot allege that

[Defendant] breached any provision of the Provider Agreement because the Provider Agreement

does not contain any obligation under any theory that [Defendant] undertook to make payments

to Northwell (directly or indirectly)."  (Moving Memo at 9, 10) The argument is baseless

because the AC does contain the alleged missing allegation, and the three cases Defendant cites

do not support Defendant's argument.

      In *USHA Holdings, LLC v. Franchise India Holdings Ltd*., 11 F. Supp. 3d 244 (E.D.N.Y.

2014) the court held the plaintiff did allege "the specific provisions of the contract upon which

liability is predicated" by pleading the defendant breached the agreement by refusing to share profits from the License, and not allowing plaintiff to participate in the management of a company. *Id*. at 276-77.

In *Mumin v. Uber Techs, Inc*., 239 F. Supp. 3d 507, 536-37 (E.D.N.Y. 2017) the court dismissed the claim of Ortega, an Uber driver alleging Uber "inflat[ed] the service fee due" to Uber from the driver's "Fares" by including in the Fares "taxes and other ancillary charges" because (1) one contract explicitly allowed Uber to "include[e] applicable taxes and fees" in the Fares, and (2) although a second contract five months later prohibited Uber from including "taxes and fees" in the Fares, the driver engaged in "pure speculation" in assuming that Uber nevertheless must have continued its practice under the prior agreement of including "taxes and other ancillary charges" in the Fares. *Id*. at 536-37.

In *GFE Glob. Fin. & Eng'g Ltd. v. ECI Ltd. (USA), Inc.*, 291 F.R.D. 31 (E.D.N.Y. 2013), the court denied a proposed amended claim for a breach of contract with respect to a bill of lading which the defendant was required to obtain and deliver to plaintiff when the machinery was shipped. The court did not allow the amended claim because plaintiff admitted defendant fully complied with its contractual obligation when it delivered the bill of lading to two former officers of plaintiff who had apparent authority to accept it on behalf of plaintiff, and plaintiff "had not pointed to any provision of the contracts that [defendant] has breached" or "to any authority for the proposition that, contractually, [defendant] had an obligation to rectify the situation created when it tendered the bill of lading to plaintiff's agents with apparent, but allegedly not actual authority." *Id*. at 34.

Defendant asserts that the *Mumin* and *GFE* cases support the dismissal of the Northwell's contract claim because Northwell "does not allege or identify any payment obligations in the Provider

Agreement that obligates [Defendant] to pay Northwell." (Moving Memo at 10) However, this case is more akin to the *USHA* case, in which the Court held the plaintiff had alleged "the specific provisions of the contract upon which liability is predicated" by pleading the terms which the defendant had breached.

Here, Northwell does plead the terms of the Provider Agreement that obligate Defendant to pay Northwell, and the terms of the Provider Agreement Defendant breached when it did not pay the correct amount due to Northwell. Specifically, the AC quotes the terms in the Provider Agreement that (i) impose upon Defendant, the pertinent defined "Payer," the obligation to pay the amounts due to Northwell for healthcare provided to patients insured under Defendant's Blue Card Plans (AC ¶¶ 22, 41), and (ii) dictate that the amount Defendant is "bound" to pay to Northwell was to be set at "the applicable rates and all other applicable terms of [the Provider] Agreement." (AC ¶¶ 21, 22, 41) The AC also pleads the manner in which the Defendant breached the Provider Agreement; *i.e.* although it was the "party" bound to pay Northwell the amount due under the terms of the Provider Agreement, Defendant did not pay the correct amount and instead breached various terms of the Provider Agreement specified and described in the AC. (AC ¶ 49(a)-(i), ¶¶50-51) These allegations pass muster under the *USHA* case.

This case is starkly different from the *Mumin* and *GFE* cases. Unlike in those cases, none of the Blue Card terms quoted from the Provider Agreement relieve Defendant of the obligations Northwell alleges are imposed by those terms, and Defendant does not identify any other terms in the Provider Agreement that might have such an effect. Nor is there anything in *Mumin* or *GFE* that supports an argument that Defendant's obligation to pay the correct amount due to Northwell expires when Defendant, or its agent acting on its behalf, delivers to Northwell a payment that is less than the contractually required amount. The defendant in *GFE* delivered a proper bill of lading to persons with apparent authority to act on the plaintiff's behalf; that fully discharged defendant's

contractual obligations.  In stark contrast, Defendant's payment to Northwell was not for the proper amount, and therefore, Defendant's obligation as the responsible "Payer" under the Provider Agreement was only partially discharged; i.e., the Defendant's obligation to pay Northwell continues until Northwell is paid the entire amount due under "the applicable rates and all other applicable terms of th[e] [Provider] Agreement."  (AC  ¶¶ 21, 22, 45-46)

Defendant appears to assert that the Provider Agreement states Empire, and not Defendant, is the "Payer" obligated to pay Northwell.  (Moving Memo at 10)  However, the AC specifically alleges that Empire is not identified as the "Payer" responsible to pay Northwell for the healthcare it provides to patients insured by Defendant's Blue Card Plans (AC  ¶¶ 22, 33), and Defendant does not cite to any term of the Provider Agreement stating otherwise.  Instead, Defendant simply assumes, that because Empire, the Host Plan, made payments to Northwell on claims for healthcare provided to patients insured under Defendant's Blue Card Plans, then Defendant could not possibly be the Payer responsible to make the payment to Northwell.  That, however, ignores the allegations in the AC that Empire only makes a payment to Northwell **as an agent for Defendant**, and only does so **after** Empire has been authorized and directed by Defendant to do so, and even then, only if Empire has access to the funds from which it would be reimbursed.  (AC ¶¶ 31-34) (emphasis added).  Absurdly, Defendant dismisses as "irrelevant" the fact that Defendant is obligated to reimburse Empire for such payments. The fact that Defendant authorizes and directs Empire, as Defendant's agent, to make a payment to Northwell on Defendant's behalf, and then immediately reimburses Empire for the payment to Northwell, plausibly supports Northwell's claim that Defendant, and not Empire, is the real payer of Northwell's claim, and the real party liable for its non-payment.  Defendant has not asserted any basis to conclude otherwise. The IRS Chief Counsel reached the same factual conclusion that Northwell pleads here.  (IRS Memo at 6-7, 8, 16)

**POINT II: The AC Pleads A Valid Third-Party Beneficiary Claim For Breach Of The Obligations By, And Between, Empire And Defendant, as BCBSA Licensees.**

The AC alleges the BCBSA entered into the same form Licensee Agreement with each of its member Licensees and that such agreements require that each Licensee "comply with the Membership Standards . . .attached as Exhibit 2," including the Standard that each of them "effectively and efficiently participate in [the Blue Card Program] . . . for the purposes of providing portability of membership between the Plans and ease of claims processing for customers receiving benefits outside of the Plan's Service Area" and that each of them also "take such action as required to ensure its financial performance in the" BlueCard Program.  (AC cite 11-13)

Northwell alleges that to comply with the Membership Standards to "effectively and efficiently participate in," and ensure their "financial performance in," the Blue Card Program, each BCBSA Licensee has agreed "that, when a person insured under a BlueCard Home Plan receives healthcare services in a Host BlueCard plan's exclusive area from an in-network participating provider of that Host BlueCard plan, then the BlueCard Home Plan had to effectively and efficiently pay or reimburse that in-network participating provider of the Host Plan in accordance with the terms of that in-network participating provider's agreement with the Host Blue Card Plan."  (AC ¶ 56; ¶¶ 15-16, 20-23, 41, 45-46)

Northwell alleges that it is a third-party beneficiary of (1) those Membership Standards, including the required obligation of the Home Plan "to effectively and efficiently pay or reimburse" the Host Plan's in-network provider "in accordance with the terms of that in-network provider's agreement with the Host Blue Card Plan," and (2) any other agreement between Empire and Defendant, or among the BCBSA Member companies as a group, with respect to the BlueCard Program.  (AC ¶ 56)

Defendant argues the third-party beneficiary claim is untenable because the BCBSA Licensee Agreements and the terms of the Blue Card Program referenced in them "do not express any intent to make Northwell an intended third-party beneficiary of the BlueCard Program." (Moving Memo at 12) However, it would be premature to dismiss the third-party beneficiary claim on this ground because Defendant has not submitted the pertinent agreements or the terms of the BlueCard Program, and it is improper for defendant to rely on its own unsupported factual statement as to what is, or is not, included in those documents. *Bild v. Konig*, 2011 WL 1563576, at *2 (E.D.N.Y. Apr. 25, 2011) (on reconsideration, reverses order dismissing third-party beneficiary claim before discovery and complete copy of the agreement at issue was before the court); *see also Thomas v. New York City*, 814 F. Supp. 1139, 1152 (E.D.N.Y. 1993) (when parties have not submitted the contract "the Court is unable to determine the issue of whether the plaintiffs are in fact third-party beneficiaries.); *Pollock v. Ridge*, 310 F. Supp. 2d 519, 526 (W.D.N.Y. 2004) (denying motion when defendant submitted unauthenticated contract). For this reason alone, the Court should deny the motion to dismiss the third-party beneficiary claim.

Defendant also argues the Court should dismiss the claim because there is no language of the contract that evidences an intent to permit enforcement by the third party. (Moving Memo at 12) However, the third party's right to enforce the agreement is upheld when (1) "no one other than the third party can recover if the promisor breaches the contract," or (2) "the contract otherwise clearly evidences an intent to permit enforcement by the third party, as by fixing the rate at which the third party can obtain services or goods." *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 45 (1985) (citations omitted). Moreover, it is appropriate to look at surrounding circumstances, not just the face of the agreement, to ascertain

if there are obligations due to a third-party beneficiary.  *Aievoli v. Farley*, 636 N.Y.S.2d 833 (2d Dept. 1996).

Here, the AC alleges the BCBSA licensees' participation in the Blue Card program includes requiring terms in their in-network provider agreements that a Home Plan is responsible to pay the healthcare claim of the in-network provider of the Host Plan at the same applicable rates in, and subject to all other terms of, the in-network agreement between the provider and the Host Plan.  (AC ¶ 56; ¶¶ 15-16, 20-23, 41, 45-46)  That the BCBSA's agreement with its licensees fixes the rate at which those licensees are to pay the local in-network provider for the treatment of the Home licensee's insureds; *i.e.,* at the amount due under the provider's agreement with its local Host BCBSA licensee, plausibly supports a claim that the BCBSA and its licensees intended to permit their in-network providers to enforce the obligation of Home BCBSA licensees to pay for the healthcare services they render to patients insured by the Home BCBSA licensee.  Moreover, when an in-network provider is not paid the correct amount required under the terms of its in-network agreement, then there is no one else, other that in-network provider, who is injured by an underpayment, and the only one with an interest to enforce its right to a payment in the proper amount under the terms of its provider agreement with the Host BCBSA Licensee.

In addition, the following surrounding circumstances show the intent to allow provider enforcement in the event of the Home Plan's breach of the obligation to pay the Host Plan's in-network provider that provided the healthcare:

> (1) the statements on the BCBSA website that the BlueCard Program is intended to link the in-network providers of one BCBSA Licensee in a single network with all other BCBSA Licensees for purposes of payment of the provider claims; (AC ¶ 14);

(2) the conduct of Empire in including in the Provider Agreement terms that require the Home BCBSA Licensee to pay Northwell, and to pay Northwell the amount due under all the terms of the Provider Agreement, which evinces Empire's understanding that including such terms in the Provider Agreement was requirement of Empire's obligation to adhere to its Licensee Membership Standards relating to the BlueCard Program; (AC ¶ 56; ¶¶ 15-16, 20-23, 41, 45-46); and

(iii) the conduct of Defendant both by accepting the benefits of the BlueCard Program requirement giving its' Home Plans access to the in-network rates of Northwell (AC ¶ 43), and by honoring its own obligation in the BlueCard Program to authorize Empire to pay Northwell on behalf of Defendant and then immediately reimbursing Empire for having done so on Defendant's behalf. (AC ¶¶ 31-34)

For these reasons, Northwell pleads a plausible claim as a third-party beneficiary of the BlueCard Program related terms in the BCBSA Licensee Agreement, and any other agreement between Empire and Defendant, or among the BCBSA Member companies as a group, with respect to the BlueCard Program.

**POINT III: The Third Cause Of Action States A Valid, Alternative Quasi-Contract Claim Against Defendant.**

**A.    Defendant benefited from Northwell's healthcare services.**

Defendant states the elements of an unjust enrichment claim are (1) the defendant benefited; (2) at the plaintiff's expense; and (3) equity and good conscience require restitution. (Moving Memo at 14)  Defendant argues the AC "does not allege that [Defendant] directly received a benefit from Northwell," without citing any basis for adding the word "directly" to the first element.  (Id.)

Moreover, defendant does not cite any support for its assertion that a provider's treatment of a patient is not a benefit to the insurer.  Courts repeatedly hold otherwise.  The benefit to the insurer "is not the provision of the healthcare services *per se*, but rather the discharge of the

20

obligation the insurer owes to its insured." *Emergency Physician Services of New York v. UnitedHealth Group, Inc*., 2021 WL 4437166 at *12 (S.D.N.Y. September 28, 2021) (*quoting Plastic Surgery Ctr. v. Aetna Life Ins. Co.*, 967 F.3d 218, 240-41 (3d Cir. 2020); *N.Y.C. Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S.2d 540, 545 (N.Y. Sup. Ct. 2011) ("an insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment to the insured's enrollees."). *See also El Paso Healthcare Sys., LTD v. Molina Healthcare of N.M., Inc.*, 683 F. Supp. 2d 454, 461-62 (W.D. Tex. 2010) (although "immediate beneficiaries of the medical services were the patients, . . . [the insurer] did receive the benefit of having its obligations to its plan members . . . discharged," which the insurer "enjoyed and accepted" and "even acknowledged as much when it tendered payment for them at a rate it deemed to be proper.").

Many other courts have reached the same conclusion. See, e.g., *Fla. Emergency Physicians Kang & Assocs., M.D.,* 526 F. Supp. 3d 1282, 1303 (S.D. Fla. 2021) (allowing claim based on benefit "provided to an insurer through a healthcare provider's provision of services to an insured") (citing cases); *Cal. Spine & Neurosurgery Inst. V. Oxford Health Ins. Inc.*, 2019 WL 6171040, at *6 (N.D. Cal. Nov. 20, 2019) (same) (citing cases); *Temple University Hospital, Inc. v. Healthcare Management Alternatives, Inc.*, 832 A.2d 501, 507 (Pa Super. 2003) ("parties virtually were compelled to operate in this manner; equitable principles are therefore particularly appropriate here."); *River Park Hospital, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 173 S.W.3d 43, 59-60 (Tenn. Ct.App. 2002) ("both parties were required to deal with one another; neither had any choice. . . .  Under these circumstances, we must find a contract implied in law, without the assent of either party, on the basis that it is dictated by reason and justice.").

The AC pleads this same and other benefits received by Defendant (AC ¶¶ 72, 76-80),

and, like the insurer in the *El Paso Healthcare* case, Defendant "even acknowledged as much when it tendered payment for them at a rate it [incorrectly] deemed to be proper.". (AC ¶¶ 71) Therefore, the AC plausibly pleads Defendant benefitted from the healthcare services Northwell provided to patients insured under Defendant's BlueCard Plans.

**B.      The AC properly pleads an alternative quasi-contract claim.**

Defendant also asserts the *quasi-contract* claim "is entirely duplicative" of the contract claims.  The claims are not duplicative.

The breach of contract claim seeks to hold Defendant liable under the Provider Agreement as the designated "Payer" responsible to pay for the healthcare services Northwell provided to Defendant's insureds. (AC ¶¶ 21-22, 33-34)  Defendant, however, asserts throughout its motion that, despite what the Provider Agreement states, Defendant is not, and Empire is, the responsible Payer in the Provider Agreement.  Anticipating Defendant would do so, Northwell therefore, plead the quasi-contract claim in the alternative; *i.e.*, it is only viable, if Defendant is correct that it is not bound as the responsible Payer.  (AC, Third Count, ¶ 57)  In that event the Provider Agreement does not bind Defendant as the Payer of Northwell's healthcare claims, then the quasi-contract would not seek any relief covered or governed by the Provider Agreement because the Provider Agreement does not identify any other "Payer" that is bound to pay Northwell for healthcare services provided to patients insured under Defendant's Blue Card Plans.  (AC ¶¶ 21-22, 33-34)

If neither Defendant, nor Empire, nor any of the other Payers specified in the Provider Agreement is the Payer responsible to pay Northwell for the healthcare services it rendered to patients insured by Defendant's Blue Card Plans, then the Provider Agreement does not govern any claim by Northwell to recover Defendant's underpayments.  Northwell, therefore, properly

pleads the quasi-contract claim in the alternative. *See Kapsis v. American Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430, 454 (E.D.N.Y. 2013) (plausible unjust enrichment claim, pleaded in the alternative, cannot be dismissed unless there is a court finding a contract governs).

Defendant also prematurely raises this argument that, even if Defendant is not bound by the Provider Agreement, that agreement still governs any right Northwell has to recover for its healthcare services provided to patient's insured under Defendant's Blue Card Plans. *St. John's University v. Bolton*, 757 F. Supp. 2d 144, 183-185 (E.D.N.Y 2010). At the pleading stage "[Northwell] is not required to guess whether it will be successful on its contract . . . or quasi-contract claims," and is allowed under Rule 8 to plead such claims in the alternative, "even if the legal theories underlying those claims are technically inconsistent or contradictory." *Id.* at 183-84. Moreover, because Defendant did not include in its Moving Papers the contract it states governs the dispute (*St. John's*, 757 F. Supp. 2d at 184), and Defendant "dispute[s] the scope and enforceability of the [pertinent] terms in the Agreements as alleged" (Id.), "the court is in no position to finally determine the meaning and effect of contracts the parties have not presented to it; [nor] can the court determine whether conduct that has yet to be established falls within the scope of the alleged contracts." *Id*. at 184. The Court should therefore deny the motion to dismiss the quasi-contract claim.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that the Court should deny, in its entirety, Defendant's motion to dismiss Northwell's Amended Complaint pursuant to Fed. R. Civ. P. 12 (b) (6) in its entirety.

DATED: New York, New York
             August 25, 2023

23

BUTLER TIBBETTS, LLC


By:       <u>   /s/ *TIMOTHY F. BUTLER* </u>
           Timothy F. Butler, Bar No. TB8749
           Meredith F. McBride, Bar No. MM2783
           David J. McCarthy, Bar No. DM7910
           *Attorneys for Plaintiff Northwell Health, Inc.*
           Nine East 45th Street, 9th Floor
           New York, NY 10017
           Telephone: (203) 656-1066
           tbutler@butlertibbetts.com